IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | : | Bankr. Case No. 15-12284-LSS |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| OPT-OUT LENDERS,[1] | : | |
| | : | |
| Appellants, | : | Civ. No. 16-110-LPS |
| | : | |
| v. | : | |
| | : | **CORRECTED OPINION,** |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | : | **ADDING FOOTNOTE 4,** |
| TA MILLENIUM, INC., and JAMES SLATTERY, | : | **ISSUED ON MARCH 20, 2017** |
| | : | |
| Appellees. | : | |

## **MEMORANDUM OPINION**

Millennium Lab Holdings II, LLC, and its affiliated reorganized debtors (collectively, the

"Debtors"), move this Court (D.I. 6) (the "Motion to Dismiss")[2] to dismiss the appeal filed by

ISL Loan Trust and certain affiliated funds (collectively, "Appellants") from an order (B.D.I.

195)[3] ("Confirmation Order") entered by the United States Bankruptcy Court for the District of

Delaware ("Bankruptcy Court") confirming the Debtors' Amended Prepackaged Joint Chapter

11 Plan of Reorganization (B.D.I. 182) (as amended, the "Plan"), on the basis that the appeal is

---

[1] Appellants are identified in Appellants' Brief in Support of Appeal from Bankruptcy Court
Order Confirming Debtors' Plan of Reorganization.  (D.I. 13 at 1)

[2] The Motion to Dismiss (D.I. 6) is joined by James Slattery (D.I. 10) as well as TA Millennium,
Inc. and TA Associates Management L.P. (D.I. 11).

[3] The docket of the Chapter 11 cases, *In re Millennium Lab Holdings II, LLC, et al.*, Case No.
15-12284-LSS (Bankr. D. Del.), is referred to herein as "B.D.I. ___."

equitably moot. For the reasons stated below, the Court will deny the Motion to Dismiss without prejudice and remand to the Bankruptcy Court for further proceedings.

## I.    INTRODUCTION[4]

The appeal of the Confirmation Order concerns a matter of some controversy: the approval of nonconsensual third-party releases (*i.e.*, the involuntary extinguishment of a non-debtor, third-party's claim against another non-debtor, third party) as part of a chapter 11 plan of reorganization. Here, the Plan released a non-debtor, third-party's direct, non-bankruptcy, common law fraud and RICO claims against non-debtor equity holders. The issues on appeal include, *inter alia*, (1) whether the Bankruptcy Court had subject matter jurisdiction to approve the nonconsensual third-party releases, and (2) whether the Bankruptcy Court had constitutional authority to permanently release the claims post-*Stern*.[5]

### A.    Adjudicatory Authority and Subject Matter Jurisdiction

Article III imposes a structural limitation on the power of an Article I court to enter final orders or judgments on state law claims without the parties' consent. As the Supreme Court explained in *Wellness Int'l Network, Ltd. v. Sharif*:

> Article III, § 1, of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Congress has in turn established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished. Because these protections help to ensure the integrity and independence of the Judiciary, "we have long recognized that, in general, Congress may not withdraw

---

[4] In the original version of this Opinion (issued on March 17, 2017), the Court inadvertently failed to include a citation to an insightful article that was of substantial assistance to the Court as it evaluated the issues addressed here. The article is entitled *On a "Related" Point: Rethinking Whether Bankruptcy Courts Can "Order" the Involuntary Release of Non-Debtor Third-Party Claims*, 23 Am. Bankr. Inst. L. Rev. 531 (2015), and was written by Eamonn O'Hagan. The Court apologizes to Mr. O'Hagan for its oversight.

[5] *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

> from" the Article III courts "any matter which, from its nature, is the subject of a
> suit at the common law . . . ."

> Congress has also authorized the appointment of bankruptcy and magistrate
> judges, who do not enjoy the protections of Article III, to assist Article III courts
> in their work . . . . Congress' efforts to align the responsibilities of non-Article III
> judges with the boundaries set by the Constitution have not always been
> successful . . . . [R]ecently in *Stern*, this Court held that Congress violated Article
> III by authorizing bankruptcy judges to decide certain claims for which litigants
> are constitutionally entitled to an Article III adjudication.

135 S. Ct. 1932, 1938-39 (2015) (internal citations omitted). It is clear from these recent

Supreme Court cases that parties have a constitutional right to have their common law claims

adjudicated by an Article III court, and that right cannot be abridged by Congressional action.

Federal bankruptcy jurisdiction is a Congressional creation under 28 U.S.C. § 1334(b),

which provides that "district courts shall have original and exclusive jurisdiction of all cases

under title 11," and original but not exclusive jurisdiction of all civil proceedings arising under

title 11, or arising in or related to cases under title 11." The authority of Bankruptcy Courts to

oversee bankruptcy matters derives from 28 U.S.C. § 157(a), which sets out that "[e]ach district

court may provide for any or all cases under title 11 and any or all proceedings arising under title

11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for

the district."

Despite the District Court's general referral of bankruptcy matters to the Bankruptcy

Court, the extent of the Bankruptcy Court's adjudicatory authority depends on the type of

proceeding before it and is subject to the bounds of the constitutional limitations described

above. Thus, Bankruptcy Courts may "enter appropriate orders and judgments" *only* in "cases

under title 11" and "core proceedings arising under title 11, or arising in a case under title 11."

28 U.S.C. § 157(b)(1). When a matter is not a "core" proceeding but rather is "related to" a

bankruptcy case, Bankruptcy Courts have authority only to "hear" the matter and submit

proposed findings of fact and conclusions of law to the Article III District Court.  28 U.S.C.

§ 157(c)(1).[6]  This limitation on the power of Article I judges to enter final orders in non-core

proceedings protects a party's constitutional right to have its common law claims adjudicated by

an Article III court.  An exception to this limitation applies where all of the parties to the

proceeding consent to the Bankruptcy Court's entry of final orders.  *See* 28 U.S.C. § 157(c)(2);

*Wellness*, 135 S. Ct. at 1942 (holding that Article III permits consent-based adjudication by

Bankruptcy Court).

### B.      Subject Matter Jurisdiction Over Nonconsensual Third-Party Releases

The permanent release of a non-debtor, third-party's claim against another non-debtor,

third party – whether through a chapter 11 plan or otherwise – is an exercise of the Bankruptcy

Court's "related to" jurisdiction.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224, 233 (3d

Cir. 2005) (holding that chapter 11 plan could not permanently enjoin third-party claims because

"related to" jurisdiction did not exist over such claims); *In re Congoleum Corp.*, 362 B.R. 167,

190-91 (Bankr. D.N.J. 2007) (stating that "first hurdle" to approval of release is establishing that

court had related to jurisdiction).  This is because a non-debtor's pre-bankruptcy claim against

another non-debtor does not "aris[e] under title 11" and does not "aris[e] in a case under title

11."  28 U.S.C. § 157(b)(1); *see also In re Digital Impact, Inc.*, 223 B.R. 1, 11 (Bankr. N.D.

Okla. 1998) (holding that controversies are not "cases under" title 11 where parties thereto are

---

[6] The District Court may then "accept, reject or modify the proposed findings of fact or
conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge
with instructions."  Fed. R. Bankr. P. 9033(d).  Any final order of judgment shall be entered by
the district judge after considering the bankruptcy judge's proposed findings and conclusions and
after reviewing *de novo* those matters to which any party has timely and specifically objected.
*See* 28 U.S.C. § 157(c)(1).

not debtors in bankruptcy, and that controversies did not "arise under" Code, because "controversies contemplated [between the parties] are not limited to causes of action under the Bankruptcy Code, such as avoidance actions"). Thus, a proceeding solely between non-debtor parties based on non-bankruptcy law can only be heard by Bankruptcy Courts under "related to" jurisdiction, and then only "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.5 (1995) ("Proceedings 'related to' the bankruptcy include . . . suits between third parties which have an effect on the bankruptcy estate."). As such, whether a Bankruptcy Court has "related to" subject matter jurisdiction over the nonconsensual release of third-party claims is frequently litigated. Once established, a common plan objection is based on the statutory edict that a Bankruptcy Court exercising "related to" jurisdiction over non-core proceedings cannot issue final orders or judgments but is instead limited to issuing proposed findings of fact and conclusions of law. *See* 28 U.S.C. § 157(c)(1).

Conversely, plan proponents frequently argue that because Congress included "confirmations of plans" in its list of "core proceedings" under the statute, the nonconsensual release of third-party claims is an exercise of the Bankruptcy Court's "arising in" or "arising under" jurisdiction when accomplished in the context of the plan, and therefore the Bankruptcy Court has authority to enter a final order releasing those claims. *See* 28 U.S.C. § 157(b)(2). The weakness of this argument is its treatment of a chapter 11 plan as a jurisdictional and

adjudicatory "blank check." Indeed, courts have repeatedly rejected this type of jurisdictional and adjudicatory bootstrapping.[7]

## C. Adjudicatory Authority Post-*Stern*

In *Stern*, the Supreme Court held it unconstitutional for Congress to give Bankruptcy Courts – which are not established under Article III of the Constitution – final adjudicatory authority over a bankruptcy estate's defamation counterclaim against an estate creditor, notwithstanding that such counterclaims are among the proceedings that Congress has listed as "core." *See* 131 U.S. at 2600-01 (concluding that although Bankruptcy Court had statutory authority to enter final judgment on certain counterclaims pursuant to 28 U.S.C. § 157(b)(2)(C), it lacked constitutional authority to render final judgment). According to the Supreme Court, the counterclaim at issue did not fall within the narrow "public rights" exception to Article III requirements;[8] rather, the claim arose under state law between private parties and was, therefore,

---

[7] *See, e.g., Combustion Eng'g*, 391 F.3d at 224-25 (explaining that even if Bankruptcy Code § 105(a) provides statutory authority for Bankruptcy Court to approve third-party release, "[section] 105 does not provide an independent source of federal subject matter jurisdiction . . . . 'Related to' jurisdiction must therefore exist independently of any plan provision purporting to involve or enjoin claims against non-debtors."); *Digital Impact*, 223 B.R. at 11 ("If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply including their release in the proposed plan, this court could acquire infinite jurisdiction").

[8] As explained by the Supreme Court, the "public rights" exception is limited "to cases in which the claim at issue derives from a federal regulatory scheme, or in which the resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action." *Stern*, 131 S. Ct at 2613. Applied to bankruptcy, the Supreme Court held that the "public rights" exception extended no farther than to claims that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id*. at 2618. By contrast, claims "between two private parties" based on state common law or statutes that are not closely intertwined with a federal regulatory program are "private" rights that must be adjudicated by an Article III Court. *See id*. at 2614.

6

a matter of "private right, that is, of the liability of one individual to another." *Id.* at 2611-12, 2614 (internal quotations omitted). That the defendant filed a proof of claim in the bankruptcy case did not alter this conclusion because: (i) the counterclaim did not arise from the bankruptcy itself; and (ii) it was not necessary to resolve the counterclaim as part of the process of allowing or disallowing the creditor's proof of claim. *See id.* at 2611. *Stern* made clear the limitation on a Bankruptcy Court's authority to enter a final order on a non-core claim for which the claimant has a constitutional right to adjudication by an Article III court. The Supreme Court later clarified that parties could consent to final adjudication by a non-Article III court. *See Wellness*, 135 S. Ct. at 1944-45.

Following *Stern,* it is clear that regardless of whether the Bankruptcy Court has subject matter jurisdiction over proceedings – both core and non-core – it cannot enter a final order releasing third-party claims unless it has constitutional authority to do so as well.

## II. BACKGROUND

### A. Events Leading to Chapter 11 Filing

Appellants[9] were lenders of approximately $106.3 million of aggregate principal amount of senior secured debt issued in April 2014 pursuant to a $1.825 billion senior secured credit facility (the "Credit Facility") which was governed by a credit agreement dated April 16, 2014 (the "Credit Agreement") among, *inter alia,* Debtors Millennium Lab Holdings II, LLC ("Holdings") and Millennium Health, LLC, f/k/a Millennium Laboratories, LLC ("Millennium"), and several other lenders (the "Lenders"). (*See* D.I. 14 at A108, A1128) The Credit Facility was issued as part of a "dividend recapitalization" transaction for the benefit of what would then be

---

[9] Appellants are investment funds and accounts managed by Voya Investment Management Co. LLC and Voya Alternative Asset Management LLC.

the non-debtor stockholders of Millennium's parent company, Holdings. (D.I. 14 at A108)  The

stock of Holdings was owned approximately 55% by non-debtor Millennium Lab Holdings, Inc.

("MLH"),[10] and approximately 45% by non-debtor TA Millennium, Inc. ("TA")[11] (MLH and

TA, collectively, the "Non-Debtor Equity Holders").  (*Id.*)  Of the $1.775 billion of term loan

proceeds under the Credit Facility, nearly $1.3 billion was paid out as a special dividend to the

Non-Debtor Equity Holders.  (B.D.I. 206, 12/11/15 Hr'g. Tr. at 8:9-8:13; D.I. 14 at A2386)

  The Debtors are providers of laboratory-based diagnostic testing services that derive

significant revenue from Medicare and Medicaid reimbursements. (D.I. 9 at M7)  As such, they

are subject to substantial regulation and oversight, including by federal and state agencies.  (D.I.

14 at A107)  As of early 2012, the United States Department of Justice (the "DOJ") was

conducting joint criminal and civil investigations into Millennium (the "DOJ Investigation").

(*Id.* at A109)  In the course of the DOJ Investigation (and prior to the issuance of the Credit

Agreement), Millennium met with the DOJ "on numerous occasions" to discuss the allegations

under investigation and produced to the DOJ approximately 11 million pages of documents.

(*Id.*)  In December 2014, the DOJ confirmed to Millennium that the DOJ would pursue claims

against Millennium.  (*Id.*)  By February 2015, the Centers for Medicare & Medicaid Services

("CMS") notified Millennium that it was revoking Millennium's Medicare billing privileges

based on billings submitted for 59 deceased patients.  (*Id.*)  On May 4, 2015, Millennium

---

[10] The stock of non-debtor MLH was owned in "various amounts" by 14 different trusts. (*See*
B.D.I. 181, Ex. B (Guarantee Agreement))  Seven of the 14 trusts were established by
Millennium founder, Chairman and former-CEO James Slattery ("Slattery") for the benefit of
himself and/or various members of his family; these seven trusts collectively owned
approximately 79.896% of the stock of non-debtor MLH.  (*Id.*)

[11] TA is an affiliate of private equity firm TA Associates Management, L.P.

received a notification that its Medicare billing privileges would be revoked also on account of its alleged submission of fraudulent claims for services without valid physician orders. (*Id.*)

On May 21, 2015, Millennium disclosed to its Lenders that it had entered into an agreement in principle with the DOJ, CMS, and various other government entities, to settle *inter alia* claims under the False Claims Act for Medicare fraud for a settlement payment of approximately $250 million. (*See* D.I. 14 at A867)  On October 29, 2015, Millennium sought approval from its Lenders to restructure its debt obligations through either an out-of-court transaction or a prepackaged plan of reorganization. (*Id.* at A80)  Consummation of an out-of-court transaction was not achieved.  On November 10, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Contemporaneously therewith, the Debtors filed their Plan (B.D.I. 14) and accompanying Disclosure Statement (B.D.I. 15).

**B.      The Proposed Nonconsensual Third-Party Release and Related Provisions**

The Plan provided a basis for the continuation of the Debtors' business.  Relevant to this appeal, the Plan also provided for a $325 million contribution by the Non-Debtor Equity Holders, specifically $178.75 million from MLH and $146.25 million from TA.  Of the Non-Debtor Equity Holders' $325 million contribution, $256 million would fund Millennium's settlement of the DOJ's claims, $50 million would be paid to certain Lenders in exchange for their early commitment to support Millennium's restructuring, and the remaining $19 million could be used as Millennium operating capital. (D.I. 14 at A92, A94, A169-A170)  In exchange for the $325 million contribution, the proposed Plan provided the Non-Debtor Equity Holders with full releases and discharges of any and all claims against them and related parties – including any claims brought directly by non-Debtor lenders such as Appellants – and including claims relating to the $1.3 billion special dividend that had been paid to the Non-Debtor Equity

Holders while the Debtors were in the midst of the DOJ Investigation. (*See* B.D.I. 195-1, Plan at

Art. X at H-K; D.I. 14 at A2208)  The proposed Plan provided no ability for parties to "opt-out"

of the third-party releases, meaning the releases would be granted upon confirmation of the Plan

regardless of whether a creditor consented. (*See* Plan, Art. X at H-K)  The proposed Plan also

permanently enjoined Appellants from commencing or prosecuting claims released pursuant to

the Plan against MLH, TA, or their Related Parties (as defined in the Plan). (*See id.*)

###    C.    The Fraud Action

On December 9, 2015, prior to the plan confirmation hearing, Appellants filed a

complaint in this Court (the "Fraud Action") against MLH, TA, TA Associates Management,

L.P., and two corporate executives who are beneficiaries of the Plan's third-party releases, James

Slattery and Howard Appel ("Defendants"). (*See ISL Loan Trust v. TA Associates Management,*

*L.P., et al.,* Civ. No. 15-1138 (GMS) (D. Del.))  The complaint demands a jury trial and asserts

the following causes of action: (i) violation of RICO and conspiracy to violate RICO (18 U.S.C.

§§ 1962(c) & (d)), based on allegations that Defendants engaged in fraudulent billing practices,

including sending illegal reimbursement requests to Medicare and state Medicaid agencies;

(ii) fraud and deceit based on intentional misrepresentation, aiding and abetting fraud, and

conspiracy to commit fraud, based on allegations that Defendants made false and misleading

representations, for the purpose of inducing Appellants to enter into the Credit Agreement,

regarding the accuracy of Debtors' financial records, Debtors' compliance with applicable laws,

and the existence of pending investigations and litigation against the Debtors; and

(iii) restitution, based on allegations that, as a result of the fraudulent inducement, Defendants

received a benefit of more than $100 million of loans issued under the Credit Agreement, which

benefits Defendants have retained at Appellants' expense. (*See* Civ. No. 15-1138 (GMS), D.I. 7

(redacted complaint)) The Fraud Action is currently stayed pending the outcome of this appeal. (*See id.*, D.I. 11)

### D. Appellants' Objections to Plan Confirmation

Appellants raised a litany of objections to confirmation of the Plan. In addition to various objections regarding the content and adequacy of the Disclosure Statement, Appellants argued that the Bankruptcy Court lacked either "arising in" or "related to" subject matter jurisdiction to approve the nonconsensual third-party release contained in the Plan. (*See* B.D.I. 122 at 17-25; B.D.I. 174 at 4-9) Appellants further asserted that, even if the Bankruptcy Court had subject matter jurisdiction, the proposed approval of the releases under section 105(a)[12] of the Bankruptcy Code would contravene other sections of the Bankruptcy Code, including section 524(e), and hence the Bankruptcy Court lacked statutory authority to approve the release provisions.[13] (*See* B.D.I. 122 at 26-28) Appellants further argued that the Plan could not be confirmed unless it permitted creditors to opt out of the third-party release (*see id.* at 29-31), and even if the Plan were so amended, exceptional circumstances did not exist to justify limiting the

---

[12] Section 105(a) permits Bankruptcy Courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]" 11 U.S.C. § 105(a). However, section 105(a) cannot be used to craft new remedies that contravene existing statutory provisions, *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014), or create substantive rights that are otherwise unavailable under applicable law, *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003).

[13] The Bankruptcy Code provides that the discharge of a debtor's indebtedness "does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Notwithstanding section 524(e), the Bankruptcy Code grants Bankruptcy Courts the ability to enjoin non-debtors' claims against other non-debtors with respect to asbestos-related liability. *See* 11 U.S.C. § 524(g) (authorizing non-debtor releases in asbestos liability cases when specified conditions are satisfied, including creation of trust to satisfy future claims); *Combustion Eng'g*, 391 F.3d at 236 n.48 (discussing same).

liability of a non-debtor to another non-debtor under Third Circuit law.  (*See id.* at 31-32 (citing

*In re Continental Airlines*, 203 F.3d 203, 213, n. 9 (3d Cir. 2000) ("*Continental II*"))

      In pre-confirmation briefing, Appellants' Plan objection did no more than touch upon the

Bankruptcy Court's lack of adjudicatory authority, in a section addressing its lack of subject

matter jurisdiction (and seemingly conflating those concepts):

> The jurisdiction of the Bankruptcy Courts is statutorily defined, and is confined to
> the boundaries of that statutory definition.  *Stern v. Marshall*, 131 S. Ct. 2594,
> 2603 (2011) (noting that Bankruptcy Courts may only "hear and enter final
> judgments in all core proceedings arising under title 11, or arising in a case under
> title 11"); *see also Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945
> (2015) (observing that "bankruptcy courts possess no free-floating authority to
> decide claims traditionally heard by Article III courts"); 28 U.S.C. § 157(a).
> Rather, Bankruptcy Courts may only enter final judgments on non-core matters
> with the consent of the affected parties.  *Wellness*, 135 S. Ct. at 1949.  Because
> the Third-Party Release would impact direct, non-bankruptcy claims held by non-
> Debtors against other non-Debtors and which would not trigger the Court's
> jurisdiction, the Court does not have ***jurisdiction*** to approve the Third-Party
> Release without the consent of the Third Party Releasing Parties.  [Appellants]
> have not given such consent.

(B.D.I. 122 at 17) (emphasis added)

      In response, Debtors accused Appellants of reading *Stern* too broadly, asserting instead

that *Stern* had left intact the Bankruptcy Court's constitutional authority to approve the third-

party releases.  (*See* B.D.I. 131 at 17)  Debtors argued that courts in this jurisdiction and others

have rejected *Stern* challenges regarding the Bankruptcy Courts' constitutional authority,

including in connection with the consideration and approval of nonconsensual third-party

releases in a plan.  (*See id.* at 17-18)  Debtors argued that adjudication of the Plan is "a unitary

omnibus civil proceeding for the reorganization of all obligations of the debtor and disposition of

all its assets" unique to bankruptcy and "not an adjudication of the various disputes it touches

upon."  (*See* B.D.I. 131 (quoting *In re Charles Street African Methodist Episcopal Church of

Boston,* 499 B.R. 66, 99 (Bankr. D. Mass. 2013))

The foregoing is the extent of the pre-confirmation briefing on the Bankruptcy Court's adjudicatory authority. (*See* D.I. 174 (Appellants' supplemental plan objection, focusing on subject matter jurisdiction and not mentioning lack of adjudicatory authority under *Stern*))

**E.     The Confirmation Ruling**

On December 10, 2015, the Bankruptcy Court held a contested hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan; at the hearing the Bankruptcy Court's lack of adjudicatory authority was only briefly addressed. (*See* B.D.I. 190 at 33-34) The Debtors referred to the *Stern* argument as a "total red herring." (*Id.* at 33) Because *Stern* addressed a Bankruptcy Court's constitutional authority to adjudicate state law claims, and because and the Plan did not adjudicate any claims, the Debtors argued *Stern*'s holding was inapplicable. (*See id.* 190 at 33-34) Debtors cited two cases from outside of this circuit, *In re MPM Silicones LLC*, 2014 WL 4436335, at *2 (Bankr. S.D.N.Y. Sept. 9, 2014), which overruled a *Stern* challenge to a plan's nonconsensual third-party releases, and the *Charles Street* case, which held that plan confirmation, including any third-party releases contained in the plan, were matters coming within the "public rights" exception, such that Congress may constitutionally assign them to a non-Article III adjudicator. (*See id.* at 33-34 (citing *Charles Street*, 499 B.R. at 99)) No further mention of the issue of the Bankruptcy Court's adjudicatory authority was made at the confirmation hearing.[14]

---

[14] The remaining arguments presented by the Debtors, Appellants, and the Office of the United States Trustee focused on whether the Bankruptcy Court had subject matter jurisdiction to approve the nonconsensual third-party releases; if so, whether the Third Circuit permitted nonconsensual third-party releases; if so, what standard applied; and whether the Plan releases met that standard. (*See* B.D.I 190)

In a bench ruling on December 11, 2015, the Bankruptcy Court overruled Appellants' objection to the nonconsensual third-party releases and confirmed the Plan. (*See* B.D.I. 206, 12/11/15 Hr'g. Tr.) Addressing Appellants' subject matter jurisdiction arguments, the Bankruptcy Court held that it had, at the very least, "related to" subject matter jurisdiction over the claims based on contractual indemnification and fee advancement obligations that satisfied the *Pacor*[15] test under Third Circuit law. (*See id.* at 13:1-15:22) The Bankruptcy Court further noted that "*Stern v. Marshall* does not change the conclusion that this Bankruptcy Court has *jurisdiction*":

> The holding in *Stern* was meant to be a narrow one; one that does not, quote, "meaningfully change the division of labor between the Bankruptcy Court and the District Court." To this end, debtors cite cases rejecting a *Stern* challenge, regarding the Bankruptcy Court's constitutional authority to consider approval of third-party releases in a plan, including Judge Drain's decision in *MPM Silicones*, but not any decisions in this district. These Courts may be correct. But because of the necessities of this case, I have not had time to address that argument. ***But I need not do so, given my finding that I have related-to jurisdiction.*** Having decided I have jurisdiction, I now turn to whether third-party releases are appropriate in this case...

(*See* id. at 15:23-16:11 (emphasis added))[16] Thus while the Bankruptcy Court's confirmation ruling included a finding that it had "related to" subject matter jurisdiction over the claims, its ruling did not address whether the Bankruptcy Court lacked adjudicatory authority to enter a final order releasing those claims.

---

[15] *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984).

[16] The Plan Confirmation Order simply stated that the Bankruptcy Court had jurisdiction under 28 U.S.C. § 1334(a) to approve the injunction, bar order, exculpation, and releases set forth in Article X of the Plan. (*See* D.I. 14, Plan Confirmation Order at A2094)

14

The Bankruptcy Court then turned to whether the third-party release was fair and necessary to the reorganization, applying five factors articulated in *Master Mortgage*[17] and ultimately returning to the *Continental II* hallmarks. (*See id.* at 17:9-26:14) Having found the releases were fair and necessary to the reorganization, the Bankruptcy Court entered the Confirmation Order. (B.D.I. 195)

On the same day, Appellants filed this appeal along with a motion to stay the Confirmation Order (B.D.I. 204) ("Stay Motion").[18] The Stay Motion was subsequently denied by the Bankruptcy Court. (B.D.I. 227) Appellants did not seek a stay in this Court or the Third Circuit, and the Debtors filed a notice of the occurrence of the Plan's effective date on December 18, 2015 (the "Effective Date"). (B.D.I. 229)

**F.      Certification of Direct Appeal**

Contemporaneously with their appeal, Appellants also filed a motion pursuant to 28 U.S.C. § 158(d)(2)(A) for certification of a direct appeal to the Third Circuit (B.D.I. 203) ("Certification Motion") with respect to several issues, including Issue 2: whether Bankruptcy Courts "have the authority to release a non-debtor's direct, fraud-based claims for willful misconduct against other non-debtors without the consent of the releasing non-debtor?" (B.D.I. 203 at 5) Although this issue speaks of "authority" to release clams – presumably referring to

---

[17] *See* B.D.I. 206, 12/11/15 Hr'g. Tr. at 17:9-24:18 (referring to *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

[18] In the bench ruling, the Bankruptcy Court stated: "[T]his is a package deal. The releases were necessary to induce the equity holders to make their three-hundred-and-twenty-five-million-dollar payment to the debtors, and to induce the ad hoc [lender] group's support of the [RSA] and the plan. Without the releases, there will be no cash contribution to pay the government settlements, and the lenders, including [Appellants], would not receive the equity of the company, valued at in excess of $900 million." (*See* B.D.I. 232, 12/18/15 Hr'g. Tr. at 14:20-15:3)

15

adjudicatory authority under *Stern* – the arguments raised in support of certification centered on permissibility of non-consensual third-party releases under Third Circuit precedent.

Appellants argued that in *Continental II,* the Third Circuit merely recognized that some courts look to whether a nonconsensual third-party release is fair and necessary to the reorganization, and that those courts have recognized certain "hallmarks of permissible non-consensual releases. " (*See id.* at 7 (citing *Continental II*, 203 F.3d at 214)) According to Appellants, however, the Third Circuit expressly declined to adopt that or any other standard for approving nonconsensual third-party releases, observing in a later opinion that *Continental II* merely "left open the possibility that some small subset of non-consensual third-party releases might be confirmable where the release is 'both necessary [to the plan of reorganization] and given in exchange for fair consideration.'" *In re Lower Bucks Hospital*, 571 App'x 139, 144 (3d Cir. 2014) (quoting *Continental II,* 203 F.3d at 214, n.11). Because "the Third Circuit has never ruled that releases of non-debtors' claims against other non-debtors are permissible *at all* outside the context of asbestos related mass tort liability, and thus never pronounced a binding legal standard for assessing whether such releases are permissible," Appellants argued that direct appeal of this issue would "enable the Third Circuit to clarify two crucial legal issues that remain undetermined in this Circuit: whether non-consensual releases of non-debtors' direct claims against other non-debtors are permissible and if so, under what circumstances." (B.D.I. 203 at 3-4)

Arguing against certification of this issue, Debtors responded that post-*Stern,* Bankruptcy Courts in this and other circuits have rejected arguments that they lack subject matter jurisdiction and authority to approve third-party releases in core proceedings such as plan confirmation. (*See* B.D.I. 234 at 9) Appellants countered that the release at issue "is the most expansive non-debtor

release ever approved in this District" (*see* B.D.I. 203 at 3) and that a Plan provision "that

releases and enjoins a vast universe of direct claims against numerous non-Debtors represents an

incredibly expansive view of the Bankruptcy Court's powers, barring [Appellants'] direct claims

(pending in an Article III court) against non-Debtors without their consent" (B.D.I. 203 at 8).   In

reply, Appellants further argued that the Debtors and other parties had, throughout the

bankruptcy proceedings, repeatedly mischaracterized their reliance on *Stern*:

> The only propositions for which [Appellants] have cited *Stern* are that (a) absent
> the consent of all affected parties, the [Bankruptcy] Court's subject matter
> jurisdiction is subject to strict statutory boundaries and (b) as an Article I court,
> the [Bankruptcy] Court lacks the power to restrict a future Article III court's
> ability to award damages to [Appellants] on account of their claims against [Non-
> Debtor Equity Holders].

(*See* B.D.I. 243 at 7)  This comprises the extent of briefing on the Bankruptcy Court's lack of

authority in connection with the Certification Motion.

     At a hearing on the Certification Motion on December 30, 2015, Appellants argued that

the issue should be certified for direct appeal in order to resolve conflicting decisions within the

Third Circuit.  Appellants argued that the Confirmation Order conflicted with decisions within

this District that did not permit nonconsensual third-party releases.  (*See* B.D.I. 253, 12/30/15

Hr'g. Tr.)  Conversely, Debtors argued that the different outcomes in cases addressing third-

party releases within the Third Circuit are driven by the unique facts of each case and, thus, were

not conflicting decisions.  Lack of adjudicatory authority was not the focus of these proceedings.

     On January 12, 2016, the Bankruptcy Court certified for direct appeal to the Third

Circuit, as a question of law requiring the resolution of conflicting decisions pursuant to

158(d)(2)(A)(ii), the issue of "whether a bankruptcy court has the authority to grant

nonconsensual third party releases over objection." *In re Millennium Lab Holdings*, 543 B.R.

703 (Bankr. D. Del. 2016).  In a thorough memorandum opinion, the Bankruptcy Court first

concluded that there is controlling precedent in the Third Circuit regarding the efficacy of

nonconsensual third party releases, citing "[t]he hallmarks of permissible nonconsensual releases

– fairness, necessity to the reorganization, and specific factual findings to support these

conclusions . . . " – which the Third Circuit set forth in *Continental II* and referred to again in

*Global Industrial*.[19] *See id.* at 713. The Bankruptcy Court further concluded that the

Confirmation Order, which approved the third-party releases without Appellants' consent,

conflicted with the Bankruptcy Court's prior holding in the *Washington Mutual* case,[20] which

held that any third-party release of a non-debtor must be based on the consent of the releasing

party (by contract or the mechanism of voting in favor of the plan). (*See id.* at 715) Because a

resolution of these conflicting decisions under Third Circuit law was required, the Bankruptcy

Court granted certification on this particular issue. (*See id.* at 717).[21] Relevant to this appeal, the

---

[19] *Continental II* identified the hallmarks of permissible nonconsensual releases – fairness, necessity to the reorganization, and specific factual findings to support those conclusions – but in the absence of those factors, declined to "speculate upon whether there are circumstances under which we might validate a nonconsensual release that is both necessary and given in exchange for fair consideration." *Continental II*, 203 F.3d at 214. In *Global Industrial*, the Third Circuit specifically relied in the *Continental II* hallmarks in remanding to the Bankruptcy Court to make sufficient findings so that, if there was a subsequent appeal, "a determination can be made on whether there is a legitimate basis for concluding that [the injunction is] necessary to the reorganization and fair." *See In re Global Industrial*, 645 F.3d 201, 215 (3d Cir. 2011).

[20] *In re Washington Mutual*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) ("This Court has previously held that it does not have the power to grant a third party release of a non-debtor . . . . Rather, any such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan). Therefore, the original language in the Plan that would mandate third party releases even in the place of an indication on the ballot that the party did not wish to grant the release would not pass muster.") (internal citations omitted). Ultimately, over objection, the *Washington Mutual* Court found that a "release for distribution" provision did not violate the best interest of creditor test and was purely voluntary. *See In re Washington Mutual*, 461 B.R. 200 (Bankr. D. Del. 2011).

[21] The Bankruptcy Court held: "Here, all of the cases within the Third Circuit cited by the parties recognize *Continental*, even *Washington Mutual*. But, my interpretation [of] what is meant by *Continental*'s hallmarks – fairness and necessity to the reorganization – differs from that of the

*Washington Mutual* decision, issued in January 2011, pre-dates the Supreme Court's decisions in *Stern* (June 2011) and *Wellness* (May 2015), and the memorandum opinion granting certification does not include any discussion of *Stern* or its progeny. Rather, the memorandum opinion addresses the issue on whether a third-party release of a non-debtor must be based on the consent of the releasing party, regardless of the type of claim at issue. On February 22, 2016, the Third Circuit denied Appellants' petition for permission to appeal pursuant to 28 U.S.C. § 158(d)(2), and the appeal was docketed in this Court on February 26, 2016.

The Debtors' Motion to Dismiss the Appeal on the basis of equitable mootness has been fully briefed. (D.I. 6, 7, 8, 9, 10, 11, 28, 33, 34, 35) Merits briefing is also complete. (D.I. 12, 13, 14, 24, 25, 26, 27, 31, 32) On October 7, 2016, the Court heard oral argument on the Motion to Dismiss and the merits of the appeal. (D.I. 44)

## III.    PARTIES' CONTENTIONS

Appellants raise several issues on appeal, but their principal challenge centers on the Bankruptcy Court's lack of adjudicatory authority: "The key question presented by this appeal is whether non-debtor Appellants' direct, state law and federal RICO claims against certain non-debtors, with respect to which Appellants have a constitutional right to adjudication by an Article III Court, can be released and permanently enjoined by an Article I Bankruptcy Court without Appellants' consent." (*See* D.I. 13 at 2) Appellants argue that regardless of whether *Continental II* intended to approve nonconsensual third-party releases in any context, that decision predated *Stern*, and *Continental II* is inconsistent with *Stern*. The impact of *Stern* is that a finding of "related to" subject matter jurisdiction under the statute does not end the inquiry. The

---

*Washington Mutual* court. Accordingly, I find that Issue 2 meets the criteria of section 158(d)(2)(A)(ii)." *Millennium*, 543 B.R. at 715.

Bankruptcy Court must have constitutional adjudicatory authority as well. Appellants argue that the release and permanent injunction of their direct, non-bankruptcy claims against other non-debtors is a final order, which the Supreme Court's decisions in *Stern* and *Wellness* forbid.[22] (*Id.*)

Conversely, Debtors argue that *Stern* left intact the Bankruptcy Court's constitutional authority to approve a plan of reorganization including third-party releases and that courts in this District have rejected *Stern* challenges regarding a Bankruptcy Court's authority to do so. (*See* D.I. 21 at 31-34) Debtors further argue that even if the Bankruptcy Court lacked the necessary constitutional authority to enter a final order approving the nonconsensual releases of Appellants' claims, review and approval of the Confirmation Order by this Court moots Appellants' constitutional authority argument. (*See id.* at 35)

By the Motion to Dismiss, Debtors contend that, notwithstanding any merits of the appeal, it must be dismissed as equitably moot, as the Plan has been substantially consummated since the Effective Date. (*See* D.I 7 at 14 (arguing that complete change of ownership and control of successor Reorganized Debtors has been effected; substantially all transfers of property contemplated by Plan have been completed; and other substantial distributions under Plan have been made and are continuing)) In support of dismissal, Debtors argue that Appellants failed to exhaust their opportunities to seek a stay of the Confirmation Order, and cannot now ask the Court to unwind the global settlement and releases that serve as the foundation of the Plan, while retaining the full benefit of the $325 million settlement contribution. (*Id.* at 2)

---

[22] Appellants further argue that the Bankruptcy Court lacked statutory authority to enter the Confirmation Order approving non-consensual third-party releases over Appellants' objection; the Bankruptcy Court lacked subject matter jurisdiction to approve the releases; and even if the Bankruptcy Court had authority and jurisdiction to approve the releases, the Bankruptcy Court erred in holding that the facts of this case warranted that extraordinary relief. (*See* D.I. 13 at 2-3)

Debtors argue that the relief sought in the appeal threatens both to fatally scramble the Plan and significantly harm third parties who justifiably have relied on the Plan Confirmation Order. (*Id.*)

## IV. JURISDICTION AND STANDARDS OF REVIEW

### A. Appeal of the Confirmation Order

This Court has jurisdiction over all final judgments, orders, and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). An order confirming a plan of reorganization is a final order. When reviewing a case on appeal, the Court reviews the Bankruptcy Court's legal determinations *de novo,* its factual findings for clear error, and its exercise of discretion for abuse thereof. *See In re United Healthcare Systems, Inc.*, 396 F.3d 247, 249 (3d Cir. 2005).

### B. Motion to Dismiss Appeal as Equitably Moot

Equitable mootness is a judge-made abstention doctrine which finds applicability in the limited context of bankruptcy, usually in an appeal following the confirmation of a plan of reorganization. *See In re SemCrude*, 728 F.3d 314, 317 (3d Cir. 2013). "Once effective, reorganizations typically implement complex transactions requiring significant financial investment." *Id.* Notwithstanding an aggrieved party's statutory right to appeal, and a federal court's "virtually unflagging obligation" to exercise the jurisdiction conferred on them, *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), in some circumstances granting the relief requested in the appeal "would disrupt the effected plan or harm third parties." *SemCrude*, 728 F.3d at 317. Parties seeking to dismiss an appeal as equitably moot contend that "even if the implemented plan is imperfect, granting the relief requested [in the appeal] would cause more harm than good." *Id.* In light of the responsibility of federal courts to exercise their jurisdictional mandate, the Third Circuit has cautioned that an

appellate court must "proceed most carefully before dismissing an appeal as equitably moot." *Id.*
at 318. "Before there is a basis to forgo jurisdiction, granting relief on appeal must be almost
certain to produce a perverse outcome – chaos in the bankruptcy court from a plan in tatters
and/or significant injury to third parties. Only then is equitable mootness a valid consideration."
*Id.* at 320 (citing *In re Phila. Newspapers LLC*, 690 F.3d 161, 168 (3d Cir. 2012) (internal
citations and quotations omitted)).

In *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (*en banc*) ("*Continental I*"), the
Third Circuit established five prudential factors to be considered in determining whether to
dismiss an appeal of a bankruptcy order as equitably moot.[23]  More recently, to reduce
uncertainty in applying *Continental I*'s "interconnected and overlapping" factors, *Phila.
Newspapers,* 690 F.3d at 168, the Third Circuit collapsed these five factors into a two-step
inquiry. *See In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). The Court's
considerations should be as follows: "(1) whether a confirmed plan has been substantially
consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally
scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan
confirmation." *Id.* at 278 (citing *SemCrude*, 728 F.3d at 321).

## V.    DISCUSSION

### A.    Equitable Mootness

Debtors' arguments in favor of dismissal on equitable mootness grounds are persuasive.
Appellants, however, argue that equitable mootness cannot prevent this Court's review of the

---

[23] *See Continental I*, 91 F.3d at 560 ("(1) whether the reorganization plan has been substantially
consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect
the rights of parties not before the court, (4) whether the relief requested would affect the success
of the plan, and (5) the public policy of affording finality to bankruptcy judgments.")

*Stern* issue. Appellants argue that the appeal implicates the Bankruptcy Court's constitutional power to act, and under well-established Supreme Court precedent this Court is obligated to decide whether the Bankruptcy Court had such power before considering whether the appeal should be dismissed under the judge-made equitable mootness doctrine. (*See* D.I. 28 at 16-19) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-104 (1998); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541-42 (1986)) Conversely, Debtors argue that in the *One2One*[24] and *Tribune*,[25] the Third Circuit has made clear that "*Stern* does not in any way impact dismissals for equitable mootness." (*See* D.I. 33 at 9-10) However, neither of those cases involved a claim that the Bankruptcy Court had acted in violation of Article III or *Stern*. Thus, the Court agrees with Appellants that it cannot consider the Debtors' motion to dismiss the appeal on equitable mootness grounds without first determining whether a constitutional defect in the Bankruptcy Court's decision deprived that court of the power to issue that decision.[26]

The Court turns to Appellants' *Stern* argument.

**B.    Lack of Adjudicatory Authority**

The Bankruptcy Court held that it had, at a minimum, "related to" subject matter jurisdiction under *Pacor*, based on its holding that certain "indemnification rights and the

---

[24] *In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015).

[25] *Tribune*, 799 F.3d at 286.

[26] Debtors noted at oral argument that they had "no objection to Your Honor dismissing this case as equitably moot except for dealing with the so-called *Stern v. Marshall* issue . . ." (D.I. 44, 10/7/16 Hr'g. Tr. at 46) "Your Honor can decide, and we cited many cases that have decided, that say that Bankruptcy Court subject matter jurisdiction to confirm plans, the central role that bankruptcy courts play under the Bankruptcy Code is completely unaffected by *Stern v Marshall*. There is Third Circuit authority to that effect and there are many other cases. So we have no problem with Your Honor deciding that limited issue, if you feel a need to, but [the Debtors] don't think you need to." (*Id*. at 46-47)

advancement rights . . . provide a sufficient nexus, such that I have jurisdiction." (B.D.I. 206, 12/11/15 Hr'g. Tr. at 13:1-14:2)  The Bankruptcy Court further held that "*Stern v. Marshall* does not change the conclusion that this Bankruptcy Court has *jurisdiction*."  (*Id.* at 15:23-15:24 (emphasis added)

This Court agrees.  However, as discussed above, subject matter jurisdiction is not the end of the inquiry, as the Bankruptcy Court must have constitutional authority as well.  It is unclear to what extent the Bankruptcy Court had the opportunity to consider what is now the main issue on appeal – the Bankruptcy Court's authority post-*Stern* to enter a final order discharging Appellants' non-bankruptcy state law claims against non-debtors without Appellants' consent – given the lack of time and attention the parties ascribed to this issue in their briefing and arguments below.  What is clear is that the Bankruptcy Court had no occasion to explain its reasoning on this issue.  As the Bankruptcy Court explained: "because of the necessities of this case, I have not had time to address that argument.  *But I need not do so, given my finding that I have related-to jurisdiction*."  (*Id.* at 16:4-16:11 (emphasis added))

Appellants argue that by holding that statutory "related to" jurisdiction is the same as constitutional adjudicatory authority to release and permanently enjoin non-debtor Appellants' non-bankruptcy state law claims against non-debtors without Appellants' consent -- or that "related to" jurisdiction confers such constitutional adjudicatory authority on the Bankruptcy Court -- the Bankruptcy Court's analysis was incorrect.  That Appellants' constitutional authority objection was not addressed in the confirmation ruling is hardly surprising, given that the argument was set forth less than clearly in the papers and at oral argument.  As summarized at length above, this objection was barely mentioned in pre-confirmation briefing, subsumed as it was in Appellants' subject matter jurisdiction arguments, and was not meaningfully addressed at

oral argument on Plan confirmation or the Certification Motion. Adjudicatory authority was not central to the Bankruptcy Court's certification opinion either.

Based on the foregoing lack of clarity in the parties' papers, coupled with the exigencies of these chapter 11 cases – including the short timeframe within which the Bankruptcy Court had to address Plan objections and rule on Plan confirmation, in order to avoid government-ordered shutdown of the Debtors' business – the Court is not convinced that the Bankruptcy Court ever had the opportunity to hear and rule on the adjudicatory authority issue.[27]

### C.    Merits of Appellants' Arguments

There appears to be no dispute between the parties that Appellants' state common law fraud and RICO claims are non-bankruptcy claims between non-debtors which do not "stem[]" from the bankruptcy itself" and would not "necessarily be resolved in the claims allowance process." *See Stern*, 131 S. Ct at 2618. Despite Debtors' reliance on *Charles Street*, the Court is not persuaded that these claims involve matters of "public rights" which could be assigned to a non-Article III court. Rather these are claims "between two private parties" based on state common law or statutes that are not closely intertwined with a federal regulatory program. *See Stern,* 131 S.Ct. at 2614. As such, Appellants appear to be entitled to Article III adjudication of these claims, and *Stern* dictates that no final order could be entered on such claims by an Article I court, barring consent of the parties (which has not been provided here). The Court is further persuaded by Appellants' argument that the Plan's release, which permanently extinguished

---

[27] *See* B.D.I. 206, 12/11/16 Hr'g. Tr. at 4 ("I'm ruling from the bench because a prompt ruling is needed in this case, given the looming December 30 deadline under the settlement agreement with the United – the U.S. settling parties; such that, a written decision is not possible. Because of this, my ruling is not as concise as it would be, and it's not as precise as it would be, or probably as well said as it would be if I had the time to draft an opinion.").

Appellants' claims, is tantamount to resolution of those claims on the merits against Appellants. *See, e.g., Digital Impact,* 223 B.R. at 13 n.6 ("A release, or permanent injunction, contained in a confirmed plan . . . has the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have an opportunity to present their claims or defenses to the court for determination . . . ."); *see also CoreStates Bank N.A. v. Huls America, Inc.,* 176 F.3d 187, 194 (3d Cir. 1999) ("The principle of claim preclusion applies to final orders overruling objections to a reorganization plan in bankruptcy proceedings just as it does to any other final judgment on a claim.")  The Court does not agree with Debtors that the Plan release did not run afoul of *Stern* because it was not a final adjudication of the claims.  If Article III prevents the Bankruptcy Court from entering a final order disposing of a non-bankruptcy claim against a nondebtor outside of the proof of claim process, it follows that this prohibition should be applied regardless of the proceeding (*i.e.,* adversary proceeding, contested matter, plan confirmation).

Debtors contend that any concerns that an Article III court must consider the third party releases on a final basis may be cured and mooted by this Court's *de novo* review, relying on the Supreme Court's decision in *Executive Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165 (2014).[28] But this Court's review of the Plan confirmation order does not satisfy constitutional concerns set forth in *Stern* and its progeny because there has been no adjudication on the merits of the

---

[28] In *Executive Benefits,* the Bankruptcy Court conducted summary judgment proceedings on the merits of the trustee's fraudulent conveyance claims and entered judgment in the trustee's favor. *Id.* at 2169.  The District Court conducted *de novo* review and affirmed. *See id.* at 2174. Because the District Court would have done the same thing had the Bankruptcy Court issued proposed findings of facts and conclusions of law, the Supreme Court concluded that the District Court had in fact adjudicated the fraudulent conveyance claims and entered a valid final judgment in compliance with Article III. *See id.* at 2175.

actions released by the Plan: Appellants' Fraud Action. The Bankruptcy Court did not conduct any proceedings on the merits of the Fraud Action, and this Court is not in any position at this point to adjudicate those claims (on which, among other things, no discovery has been taken).[29] Debtors' argument that this Court's *de novo* review of the confirmation order can cure *Stern* concerns – as "the factual record is uncontroverted and satisfies the controlling standard for approval of nonconsensual third party releases" – misses the point. As Appellants argue, affirming the Bankruptcy Court's approval of the release would do nothing more than ratify the entry of a judgment extinguishing Appellants' claims without an actual adjudication of them on the merits by an Article III judge. Thus, this Court's review of the Plan Confirmation Order cannot resolve the constitutional concerns set forth in *Stern*.

### D.    Remand for Further Proceedings

Notwithstanding the seeming merits of Appellants' arguments, the Court will not rule on an issue that the Bankruptcy Court itself may not have ruled upon, especially in light of the fact that this issue has now become Appellants' primary argument on appeal. Further proceedings are necessary. The Court will therefore remand this case to the Bankruptcy Court to consider whether, or clarify its ruling that, the Bankruptcy Court had constitutional adjudicatory authority to approve the nonconsensual release of Appellants' direct non-bankruptcy common law fraud

---

[29] Debtors assert that Appellants had the opportunity in the Bankruptcy Court to present whatever evidence they wished at the Plan confirmation hearing, suggesting that Appellants have already been offered the trial to which Appellants claim they have been unconstitutionally deprived. (*See* D.I. 44, 10/7/16 Hr'g. Tr. at 14-15; 69-70) The Court understands Debtors' argument essentially to be that even if Appellants are correct that they had a right to a trial on their fraud and RICO claims, Appellants waived that right. This issue has not been presented yet to the Bankruptcy Court. As part of the proceedings on remand, the Bankruptcy Court is free to consider whether, even if Appellants had a right to a trial that was impermissibly eliminated by the third-party nonconsensual releases that, in any event, Appellants independently waived their right to such a trial. The Court does not mean to suggest it has already determined the correct answer to this question.

and RICO claims against the Non-Debtor Equity Holders; and, if it does not have such authority, to submit proposed findings of fact and conclusions of law regarding the final disposition of these claims through the Confirmation Order, or, alternatively, to strike the nonconsensual release of Appellants' claims from the Confirmation Order.

The Court recognizes such a remand is far from ideal at this stage of the Chapter 11 proceedings. Still, given its experience and expertise, the Bankruptcy Court should rule on this issue first.

## VI.     CONCLUSION

For the reasons explained above, the Court will deny without prejudice the Motion to Dismiss the Appeal as equitably moot and remand to the Bankruptcy Court for further proceedings. A separate Order will be entered.

March 20, 2017
Wilmington, Delaware
**[CORRECTED VERSION]**

HON. LEONARD P. STARK
UNITED STATES DISTRICT JUDGE